UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MAXI DRUG, INC., d/b/a
BROOKS PHARMACY,
50 Service Road
Warwick, RI 02886,

       Plaintiff,

vs.                             Case No.

BIOVAIL CORPORATION; BIOVAIL
TECHNOLOGIES, LTD.; ELAN
CORPORATION, PLC; ELAN
PHARMACEUTICAL RESEARCH
CORPORATION; and TEVA
PHARMACEUTICALS USA, INC.,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Maxi Drug, Inc. d/b/a Brooks Pharmacy ("Brooks") sues Defendants Biovail

Corporation and Biovail Technologies, Ltd. (collectively "Biovail"), Elan Corporation, plc and Elan

Pharmaceutical Research Corporation (collectively "Elan"), and Teva Pharmaceuticals USA, Inc.

("Teva"), and for its Complaint alleges as follows:

Nature of the Action

1.      This is a civil antitrust action seeking treble damages and other relief arising

out of an unlawful conspiracy in restraint of trade among Defendants Elan, Biovail and Teva.

Biovail, Teva and Elan have restrained competition in the sale of generic versions of Bayer

Corporation's brand-name drug Adalat CC (generically referred to as nifedipine), a frequently prescribed pharmaceutical used for the treatment of hypertension.

2.     Biovail, Teva and Elan entered into an unlawful agreement that Teva participated in negotiating, under which Biovail/Teva acquired exclusive marketing rights to Elan's generic version of Adalat CC, so that only one generic version of the drug in each strength would be sold by the members of the conspiracy, even though both Biovail/Teva and Elan had received FDA approval to market competing generic versions of Adalat CC.

3.     The illegal agreement, which provided Biovail/Teva with at least a 15-year term to market Elan's generic version of Adalat CC, has permitted Biovail/Teva to sell generic Adalat CC at supracompetitive prices.  As discussed in more detail below, the first generic version of a branded product enjoys a 180-day exclusivity marketing period, and is typically sold during that period at  a price that is at least 25% less than the price of the branded product.  Following the expiration of the 180-day exclusivity period, the introduction of a second, competing generic product typically results in a substantial decrease in the price of the first generic product.  Following the introduction of a second generic product, competition among the generic products typically results in both products being sold at prices 60-80% less than the price of the branded product.

4.     As a result of the unlawful agreement, Biovail/Teva was able to continue to enjoy *de facto* generic exclusivity far beyond 180 days and to continue to price its product at a higher price than would otherwise have prevailed.  Defendants' agreement had the purpose and effect of: (1) eliminating competition between Biovail/Teva and Elan; (2) allocating the sales of generic Adalat CC to Biovail/Teva; (3) allocating a portion of Biovail/Teva's supracompetitive profits to Elan; (4) fixing, raising, maintaining, or stabilizing the price of generic Adalat CC; and (5) depriving Plaintiff

of the benefits of competition between Biovail/Teva and Elan. Accordingly, the agreement constitutes an unlawful conspiracy in restraint of trade in violation of the federal antitrust laws.

5.      The claims asserted by Brooks in this action were previously asserted on behalf of Brooks (and/or its assignor) in a class action captioned *SAJ Distributors, Inc. et al. v. Biovail Corp. et al.*, Case No. 1:02CV1931, currently pending in this Court. The limitations period applicable to Brooks' claims was tolled from the filing of the *SAJ Distributors* complaint in 2002 until the filing of this Complaint. *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974) ("commencement of a class action tolls the applicable statute of limitations as to all members of the class").

<u>Jurisdiction and Venue</u>

6.      This is a private antitrust action brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, arising out of Defendants' violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has subject-matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

7.      Defendants are found or transact business within this district, and the interstate trade and commerce hereinafter described were carried out in substantial part within this district. In addition, the Judicial Panel on Multidistrict Litigation has transferred related actions to this district for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Therefore, venue is proper pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), 1391(c) and 1407.

<u>The Parties</u>

7.      Plaintiff Maxi Drug, Inc., d/b/a Brooks Pharmacy, is a Delaware corporation having its principal place of business in Warwick, Rhode Island. Brooks owns and operates retail

stores in several states at which it dispenses prescription drugs to the public. During the relevant

period, Brooks purchased generic Adalat CC directly from Defendants. Brooks brings this action

in its own behalf and as the assignee of McKesson Corporation, a pharmaceutical wholesaler which

purchased generic Adalat CC directly from Defendants for resale to Brooks and which has assigned

its antitrust claims arising from those purchases to Brooks.

        8.     Defendant Biovail Corporation is a Canadian corporation with its principal

place of business in Mississauga, Ontario, Canada. Biovail Corporation is an international full-

service pharmaceutical company, engaged in the formulation, clinical testing, registration and

manufacture of drug products utilizing advanced drug delivery technologies. Defendant Biovail

Technologies, Ltd. is a United States subsidiary of Biovail Corporation located in Chantilly,

Virginia. Shares of Biovail Corporation trade on the New York and Toronto Stock Exchanges.

        9.     Defendant Elan Corporation, plc is an Irish corporation with its principal place

of business in Dublin, Ireland. Defendant Elan Pharmaceutical Research Corporation is a wholly-

owned United States subsidiary of Elan Corporation, plc. Elan Corporation, plc is a leading

worldwide specialty pharmaceutical company, with its principal research and manufacturing

facilities in Ireland, the United States and Israel. Shares of Elan Corporation, plc trade on the New

York, London and Dublin Stock Exchanges.

        10.     Defendant Teva Pharmaceutical USA, Inc. is a United States subsidiary of

Teva Pharmaceutical Industries, Ltd., an Israeli corporation, with its principal place of business in

North Wales, Pennsylvania. Teva is the exclusive marketing agent for generic Adalat CC in the

United States through its joint venture agreement with Biovail. Teva acted as an agent, joint venturer

4

and co-conspirator with Elan and Biovail in forming and carrying out the unlawful conspiracy in restraint of trade described below.

Trade and Commerce

11.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

Operative Facts

Federal Regulation of New Pharmaceutical Products

12.    Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, approval by the Food and Drug Administration ("FDA") is required before a new drug may be sold in interstate commerce.  Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

13.    Under the Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Amendments to the Food and Drug Act or the Hatch-Waxman Act, a drug manufacturer may seek expedited FDA approval to market a generic version of a brand-name drug by filing an Abbreviated New Drug Application ("ANDA") pursuant to 21 U.S.C. § 355(j).  An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand-name drug.  Congress's principal purpose in enacting the Hatch-Waxman Amendments was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

14.     An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied:

I.      the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification");

II.     the patent or patents have expired (a "paragraph II certification");

III.    the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or

IV.     the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification").

21 U.S.C. § 355(j)(2)(A)(vii).

15.     If (as was the case here) the generic manufacturer makes a paragraph IV certification, it must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Upon receipt of a paragraph IV certification, the patent owner can initiate a premarketing patent infringement action within 45 days. If no such action is brought, the FDA may approve the ANDA without regard to patent issues. If an infringement action is brought within 45 days, the FDA approval of the ANDA is delayed until the earliest of (I) patent expiration, (ii) final determination by a court of invalidity or non-infringement, or (iii) 30 months. 21 U.S.C. § 355(j)(5)(B)(iii).

16.     Under the Hatch-Waxman Act, the first generic company to file a paragraph IV certification against a listed patent in connection with an ANDA for a particular generic drug is eligible to receive 180 days of marketing exclusivity, during which the FDA will not permit any

other generic manufacturers of that drug to market the same drug. The 180 days begin to run when the company entitled to exclusivity launches its product, or when the patent is held to be invalid or not infringed, whichever occurs earlier.

17.    During the 180-day exclusivity period, the first filer's generic drug is typically priced 25-40% below the price of the equivalent branded product. Following the exclusivity period, entry of additional generic products typically causes the price of all generic products, including the first filer's, to fall significantly. This price competition benefits all direct purchasers of the drug because they are able to pay lower prices for the generic product and, in addition, to substitute additional purchases of the generic product for purchases of the branded product.

Nifedipine-based Products

18.    Nifedipine is a coronary vasodilator used in various forms primarily for the treatment of hypertension. Nifedipine is one of a class of drugs known as calcium channel blockers ("CCBs"). CCBs cause the smooth muscle cells of blood vessels to dilate, which results in the reduction of blood pressure. Nifedipine is one of a subclass of CCBs known as dihydropyridines. Dihydropyridines differ from other subclasses of CCBs in that they tend to increase the heart rate and have a strong effect on the systemic circulation which makes them potent anti-hypertension agents. Dihydropyridines are, therefore, primarily used for patients with hypertension and minimal cardiovascular complication or early stage heart disease. Other classes of CCBs have a more neutral effect on heart rate and may reduce it, producing a cardio-protective effect and are thus better suited for patients with more advanced heart disease. Within the dihydropyridines subclass, nifedipine is distinguishable from other dihydropyridines, because it contains agents that produce differing side effect profiles and differing effects on heart rate. These factors make nifedipine more tolerable in

7

some patients than other dihydropyridines.  Thus, other dihydropyridines and other CCBs are not therapeutically interchangeable with nifedipine.

19.     Multiple dose immediate release nifedipine formulations, moreover, are not readily substitutable for extended-release nifedipine formulations.  Extended release formulations of nifedipine are the preferred CCBs in the United States market for treatment of hypertension and angina.  For a large number of patients, extended release once-daily forms of nifedipine are necessary to provide safe, effective treatment for hypertension.

20.     Extended release technology allows for the continuing and slow release of a drug into the patient's bloodstream over a period of time.  A principal advantage of the extended release form of administration is that it increases patient compliance. Hypertension is a "silent disease" – often having no symptoms such as pain or discomfort – so that patients frequently forget or neglect to take their prescribed medication.  In the case of nifedipine, the better patient compliance achieved with an extended release dosage (as compared to multiple daily doses of an immediate release product) overcomes one of the important problems encountered by doctors in the treatment of hypertensive patients.  Another principal advantage of the once-daily extended release form of administration is that it avoids undesirable fluctuations in nifedipine concentrations in the patient's blood, as may occur with multiple daily doses of immediate release or even with twice-daily forms.

21.     Bayer holds an approved New Drug Application for an extended-release formulation of nifedipine that it sells under the brand name Adalat CC.

22.     The only other branded once-daily extended release version of nifedipine available in the United States is called Procardia XL, marketed by Pfizer Corporation.

23.     When a physician prescribes Adalat CC, a pharmacist cannot substitute another extended-release nifedipine product unless that product has been approved by the FDA as a generic equivalent to Adalat CC.  Procardia XL has not been so approved.  Adalat CC and Procardia XL have different pharmokinetic profiles, are not bioequivalent, and are used by prescribing physicians in different circumstances.

24.     In 2000, Adalat CC was the 70th most prescribed drug in the United States with 5.9 million prescriptions filled.  Bayer recorded more than $300 million in sales of Adalat CC in the United States in 2000.

Generic Adalat CC

25.     On April 30, 1997, Elan filed the first ANDA with the FDA for a generic version of 30 mg Adalat CC.  Elan's ANDA included a paragraph IV certification that its product would not infringe any valid claim of any of Bayer's patents.

26.     Within 45 days of receiving notice of Elan's paragraph IV certification, Bayer filed a patent infringement action under the Hatch-Waxman Act styled *Bayer AG and Bayer Corporation v. Elan Pharmaceutical Research Corporation and Elan Corporation, Plc*, no. 97-cv-143 (N.D. Ga.).  Bayer's filing of the action resulted in a 30-month stay of final approval of Elan's ANDA.

27.     On December 9, 1997, Biovail filed an ANDA for a second generic version of 30 mg Adalat CC.  On the same day, Biovail also filed the first ANDA for a generic version of 60 mg Adalat CC.  As a result of Biovail's ANDAs, Bayer brought patent infringement actions against Biovail in the District of Puerto Rico and the District of Columbia.

28.     On March 16, 1999, Judge William O'Kelley of the United States District Court for the Northern District of Georgia granted Elan's motion for summary judgment, finding that Elan's 30 mg generic product did not infringe Bayer's patent. *Bayer AG v. Elan Pharm. Research Corp.*, 64 F. Supp. 2d 1295 (N.D. Ga. 1999).

29.     Following its patent victory, Elan announced that it viewed the introduction and sale of generic Adalat CC as an important part of its growth strategy as it completed its "transition from a licensing and contract development company to a fully integrated specialty pharmaceutical company."

30.     On May 28, 1999, the FDA notified Elan that its ANDA for 30 mg generic Adalat CC was tentatively approved.

31.     On June 29, 1999, the FDA tentatively approved Biovail's ANDAs for its competing generic version of 30 mg Adalat CC and for its 60 mg generic Adalat CC.

32.     On June 30, 1999, Elan filed the second ANDA for a 60 mg strength generic Adalat CC.  On September 24, 1999, Bayer filed a patent infringement suit against Elan under the Hatch-Waxman Act relating to Elan's 60 mg generic version of Adalat CC.

The Biovail/Teva-Elan Agreement

33.     On or about October 14, 1999, Elan and Biovail entered into an Agreement which granted to Biovail and its marketing agent Teva the exclusive rights to market Elan's generic version of Adalat CC in the United States for 15 years.  In exchange, Biovail agreed to pay Elan a minimum of $73.5 million over six years.  The Agreement prohibits Elan from selling its generic versions of Adalat CC in the United States in competition with Biovail/Teva for the duration of the

agreement. The Biovail-Elan Agreement is an agreement not to compete in the sale of generic Adalat CC and to share the monopoly profits resulting from the absence of such competition.

34. On March 10, 2000, the FDA granted final approval to Elan for its 30 mg generic product.

35. Previously, Biovail and Teva had entered into an agreement under which Teva obtained the exclusive rights to market and distribute in the United States certain pharmaceutical products manufactured by Biovail. Under this agreement, Biovail and Teva shared profits from the sales of such products after deduction of Biovail's manufacturing costs, and certain costs of selling and distribution incurred by Teva.

36. Teva actively participated in the negotiations leading up to the October 1999 Agreement between Biovail and Elan and was a party to the illegal conspiracy reflected therein. As a result of Teva's marketing agreement with Biovail and the Agreement between Biovail and Elan, Teva became the agent and/or joint venturer of Biovail and Elan as the exclusive distributor of generic versions of Adalat CC in the United States, and knowingly shared in the unlawful profits resulting from the illegal Biovail-Elan Agreement.

37. On March 13, 2000, Biovail announced the immediate launch, through its marketing agent and joint venture partner Teva, of Elan's 30 mg generic version of Adalat CC.

38. Following this initial launch, on May 8, 2000, notwithstanding the March 16, 1999 ruling of non-infringement, Bayer again filed suit against Elan, Biovail and Teva for patent infringement under 35 U.S.C. § 271(a) based on the commercial sale of the 30 mg generic product.

39. On May 12, 2000, the United States Court of Appeals for the Federal Circuit affirmed Judge O'Kelley's March 16, 1999 grant of summary judgment to Elan on the issue of non-

11

infringement of Bayer's patent. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241 (Fed. Cir. 2000). On November 13, 2000, the United States Supreme Court denied Bayer's petition for a writ of certiorari.

40.     On or about September 10, 2000, the 180-day exclusivity period expired on Elan's 30 mg generic version of Adalat CC.

41.     On December 4, 2000, the FDA granted final approval to Biovail's 30 mg and 60 mg ANDAs for generic Adalat CC. Biovail launched its 60 mg product immediately thereafter, but took no action with respect to the 30 mg product. But for Defendants' unlawful agreement, Elan would have launched its own 30 mg generic product upon final approval in March 2000, and Biovail would have launched a second 30 mg generic product in December 2000. With the introduction of a second generic product in the 30 mg strength, the price of both 30 mg generic products would have fallen significantly below the current price. The purpose and effect of Defendants' unlawful agreement was to prevent such competition and to continue, beyond the expiration of the 180-day exclusivity period, supracompetitive pricing for both strengths of generic Adalat CC.

42.     On March 20, 2001, the FDA tentatively approved Elan's ANDA for its generic version of 60 mg Adalat CC.

43.     On March 21, 2001, Judge O'Kelley dismissed Bayer's patent infringement action against Elan regarding Elan's 60 mg generic product, ruling that Bayer's patent was not infringed.

44.     On March 29, 2001, Judge O'Kelley dismissed, on collateral estoppel grounds, Bayer's section 271(a) infringement action against Elan, Biovail and Teva with respect to the 30 mg product, effectively ending Bayer's legal challenges.

45.    On or about June 4, 2001, Biovail's 180-day exclusivity period expired with respect to the 60 mg generic version of Adalat CC.

46.    On October 26, 2001, the FDA granted final approval to Elan's ANDA for its 60 mg generic version of Adalat CC. But for Defendants' unlawful agreement, Elan would have launched its own competing 60 mg generic product shortly thereafter, which would have caused the price of both 60 mg generic products to fall significantly below the then-current price. The purpose and effect of Defendants' agreement was to prevent such competition and to continue, beyond the 180-day exclusivity period, supracompetitive pricing for both strengths of generic Adalat CC.

Effects of the Agreement

47.    The unlawful agreement had the purpose and effect of restraining generic competition. As a result of Defendants' agreement, the conspirators jointly produced and sold only one generic version of Adalat CC in the 30 mg and 60 mg strengths and shared the supracompetitive profits generated by those sales. Had Biovail/Teva and Elan each launched competing versions of the 30 mg and 60 mg products, the prices of those generic products would have been less than half the prices actually charged by Biovail/Teva and the rate at which the generic was substituted for Adalat CC would have increased.

48.    The unlawful agreement eliminated competition between Biovail/Teva and Elan for sales of generic Adalat CC by preventing entry of a competing 30 mg generic product from December 2000 through the present, and by preventing entry of a competing 60 mg generic product from October 2001 through the present. During those time periods, Plaintiff and other purchasers of the affected products have been forced to pay supracompetitive prices for those products rather than competitive prices.

13

49.     In August 2002, as a result of a Consent Order negotiated by the Federal Trade Commission, Biovail and Elan, Watson Pharmaceuticals, Inc. acquired exclusive U.S. rights to Elan's 30 mg and 60 mg dosage strengths of generic Adalat CC, in return for $43 million in cash. Watson thereafter began selling 60 mg generic Adalat CC in the United States in competition with the 60 mg product being sold by Biovail/Teva. But for the illegal agreement, this competition would have occurred much earlier.

Relevant Market

50.     Plaintiff contends that Defendants' conspiracy to restrain competition among generic versions of Adalat CC is a *per se* violation of section 1 of the Sherman Act, for which no definition of the relevant market is required. To the extent that a market definition is found to be required, the relevant product market is the sale of extended release once-daily 30 mg and 60 mg tablets of Adalat CC and their generic equivalents, and the relevant geographic market is the United States.

Antitrust Violations

51.     From approximately October 14, 1999 through the present, Defendants have engaged in a continuing contract, combination and conspiracy among themselves and with others, in unreasonable restraint of interstate trade and commerce, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

52.     Defendants' unlawful conspiracy has been undertaken for the purpose and with the effect of (1) eliminating competition between Biovail/Teva and Elan for sales of generic Adalat CC; (2) allocating sales of generic Adalat CC to Biovail/Teva; (3) allocating a portion of Biovail/Teva's monopoly profits to Elan; (4) fixing, raising, maintaining and stabilizing the price

14

of generic Adalat CC at supracompetitive levels; and (5) depriving Plaintiff and other purchasers of the ability to purchase cheaper generic Adalat CC.

53.     By entering into a horizontal agreement to allocate markets and fix prices, Defendants have committed a *per se* violation of section 1 of the Sherman Act.

54.     In the alternative, Defendants' conspiracy has had a substantially adverse effect on competition in the relevant market and therefore violates section 1 of the Sherman Act under the rule of reason. The market effects of Defendants' conduct include those effects set forth in paragraph 52 above.

55.     As a direct and proximate result of Defendants' illegal conduct, Plaintiff has been deprived of the benefits of price competition between Biovail/Teva and Elan and have been substantially overcharged on their purchases of 30 mg and 60 mg generic Adalat CC. Plaintiff may also have been overcharged on purchases of 30 mg and 60 mg branded Adalat CC in that a competitive price for the generic products would have resulted in increased substitution of the generic product for the brand product. Plaintiff's injury is injury of the kind the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

56.     Plaintiff began to suffer antitrust injury in December 2000 in connection with the 30 mg generic Adalat CC product and in October 2001 in connection with the 60 mg product. Plaintiff's cause of action accrued no earlier than December 2000. As noted in paragraph 5 above, Plaintiff's cause of action was tolled from the filing of the *SAJ Distributors* complaint in October 2002 until the filing of this Complaint.

<u>Demand for Jury Trial</u>

Plaintiff hereby demands a trial by jury of all issues so triable.

<u>Prayer for Relief</u>

Wherefore, Plaintiff prays for judgment against Defendants, jointly and severally, and for the following relief:

A.    A declaration that Defendants have violated the Sherman Act in the manner alleged above;

B.    Three times the damages actually sustained by Plaintiff, as determined by a jury;

C.    The costs of this suit, including a reasonable attorneys' fee; and

D.    Such other and further relief as the Court deems just and proper.

Dated: March 20, 2006

Respectfully submitted,

Robert D.W. Landon, III
KENNY NACHWALTER, P.A.
1100 Miami Center
201 S. Biscayne Boulevard
Miami, Florida 33131-4327
Tel.: (305) 373-1000
Fax: (305) 372-1861
*Attorneys for Plaintiff*

Of counsel:
Richard Alan Arnold
Scott E. Perwin
Lauren C. Ravkind
KENNY NACHWALTER P.A.
1100 Miami Center
201 S. Biscayne Boulevard
Miami, FL 33131-4327
Tel.: (305) 373-1000
Fax: (305) 372-1861

16